IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BOARD OF EDUCATION OF
ALBUQUERQUE PUBLIC SCHOOLS,

      Plaintiff,

v.                                                      Cause No.

DONNIE BRAINARD and VIKTORIA SZOLNOKI-BRAINARD,
as parents of N.B.,

      Defendants.

**COMPLAINT BY BOARD OF EDUCATION OF ALBUQUERQUE PUBLIC SCHOOLS FOR REVIEW OF HEARING OFFICER'S MEMORANDUM DECISION AND ORDER**

      COMES NOW the Board of Education of the Albuquerque Public Schools ("District"), by and through its attorneys, ADAMS+CROW LAW FIRM, and submits its Complaint for Review of the Memorandum Decision and Order rendered by the Due Process Hearing Officer in *Donnie Brainard and Viktoria Szolnoki-Brainard, as parents of N.B. v. Albuquerque Public Schools*, DPH #1920-04.

### INTRODUCTION

      1.     This Complaint seeks review of the Memorandum Decision and Order ("Decision") rendered by the Due Process Hearing Officer ("DPHO") on April 1, 2020.

      2.     The underlying administrative due process proceedings were conducted pursuant to the Individuals with Disabilities Education Act ("IDEA") and the New Mexico Administrative Code. 20 U.S.C. §§ 1400 et seq; 6.31.2.13 NMAC. See Exhibit A (Hearing Officer's Memorandum Decision and Order), attached hereto.

      3.     The ultimate goal of IDEA is to provide each student with a Free Appropriate Public Education through the development and implementation of an Individualized Education Program ("IEP") designed by a team of teachers and staff, including the student and their parent(s).

20 U.S.C. § 1401(11); 20 U.S.C. § 1414(d). The IEP Team assesses the student's needs and develops the written IEP to document the types of services and/or specialized instruction needed to support the student's access to curriculum and to enable the student to make progress appropriate in light of his circumstances. Classroom assignments where educational and related services are provided are not based upon a student's eligibility or "label;" rather, a student's placement – or package of services – may be implemented in many different types of classrooms across a school district.

4. At the administrative level, the Parties filed a Joint Statement of Issues, attached hereto as Exhibit B, identifying seventeen (17) issues. At the crux of the administrative matter was the request by Petitioners (named as Defendants in the case *sub judice*) that the DPHO prohibit the District from re-assigning N.B. from a classroom at Mark Twain Elementary School, which Defendants believed was more suited for student with autism, to a classroom at Montezuma Elementary School where, it was determined by the IEP Team, that N.B.'s social-emotional needs could be more successfully addressed. The DPHO found Defendants did not prevail on that primary issue.

5. As to the seventeen issues, the Decision found in favor of the District on fourteen (14) and in favor of the Defendants on three (3).

6. The District seeks review of the Decision and reversal only of two issues of the Decision in which the DPHO found against the District; the remainder of the Decision is not challenged in this civil action.

7. The District also seeks equitable relief in the form of a stay of a portion of the Decision pending resolution of this appeal.

## JURISDICTION, PARTIES AND VENUE

8. This Court has jurisdiction pursuant to IDEA, 20 U.S.C. § 1415(i); 34 C.F.R. § 300.516; and NMAC 6.31.2.13(I)(25)(a).

9. This Complaint is timely, as it is filed within thirty days of the date the Decision was received. NMAC 6.31.2.13(I)(25)(a).

10. Upon information and belief, Defendants are the parents and legal guardians of N.B., an eight-year-old student ("Student").

11. At all times material hereto, Student resided within District geographic boundaries and attended school in the District with the exception of the period of time Defendants acted unilaterally in removing Student from school; the Student qualifies under IDEA for receipt of special education services as a student with a disability who, by reason thereof, requires specialized instruction.

12. Upon information and belief and at all times relevant hereto, Defendants and Student resided in Albuquerque, New Mexico.

13. The Board of Education of the Albuquerque Public Schools is an entity with the capacity to sue and be sued and has the duty to govern the District pursuant to NMSA §§ 22-1-2(H), 22-5-4(A) and 22-5-4(E).

14. The District is a local public school district located in Albuquerque, Bernalillo County, New Mexico.

15. All claims arose in Bernalillo County, New Mexico; venue properly rests in the United States District Court for the District of New Mexico. 28 U.S.C. § 1391(b)(c).

## LEGAL STANDARDS

16. A party aggrieved by a decision of a DPHO's decision in an IDEA proceeding may seek review of that decision pursuant to 20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516(a); and 6.31.2.13(I)(25)(a) NMAC.

17. In the underlying administrative due process proceeding, Defendants, who challenged the District's implementation of Student's IEP, had the burden of proof by a preponderance of the evidence. See Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49 (2005); see also Johnson v. Independent School Dist. #4 of Bixby, 921 F.2d 1022 (10th Cir. 1990).

18. Congress requires district courts apply a modified *de novo* standard when reviewing a DPHO's decision. See IDEA, 20 U.S.C. § 1415(i)(2)(C); Garcia v. Bd. of Educ. of Albuquerque Public Schools, 520 F.3d 1116 (10th Cir. 2008) (citing Murray v. Montrose County Sch. Dist., 51 F.3d 921, 927 (10th Cir. 1995)). While due weight is given to the administrative proceedings, a district court must base its decision on the preponderance of evidence. Garcia, supra; 20 U.S.C.§ 1415(i)(2)(C); Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982); accord Endrew F. ex. rel. Joseph F. v. Douglas County Sch. Dist. RE-1, 137 S.Ct. 988, 996 (2017).

19. IDEA commands that the district court "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(c)(ii).

## COUNT ONE

**The DPHO Incorrectly Applied an Arbitrary Legal Standard When Determining Whether the District Failed to Implement the SLP Evaluation Required by the March 4, 2019 IEP**

20. The District incorporates each and every of the preceding paragraphs as if fully restated herein.

21. One of the issues in the administrative matter was whether the Defendants proved by a preponderance of evidence that the District violated the law in conducting a speech and

language re-evaluation of N.B. after the IEP Team determined on March 4, 2019 that such a re-evaluation was necessary.

22. Neither federal nor state legal requirements impose a deadline for the District to have completed such a re-evaluation.

23. Yet, in the Decision, the DPHO improperly applied a "time" standard articulated in 34 C.F.R. §300.323(c)(2) to conclude that Student's speech language re-evaluation was to have been completed by the District "as soon as possible" after the March 4, 2019 IEP meeting. See Ex. A, at p. 50.

24. The federal regulation and the case law upon which the DPHO relied to incorrectly impose this arbitrary deadline applies to the time frame for a school district to **initiate** special education and related services *for a student who has just been identified for the first time as a student in need of special education.* That is, the time frame imposed by the DPHO applies to implementation of a student's **initial** IEP but does not apply when, as here, a student is already receiving IEP services but the IEP Team seeks a *re-evaluation* of a particular area of need. By misapplying the wrong section of the regulation, the DPHO improperly imposed an arbitrary deadline for completion of the SLP evaluation at issue in the IDEA administrative matter. See 34 C.F.R. §300.323.

**The DPHO Improperly Determined that Defendants Showed by a Preponderance of the Evidence that the District Failed to Implement the IEP's SLP Assessment Language**

25. The DPHO's Decision did not identify at what point (on what date) the District failed to satisfy the "as soon as possible" requirement for implementing the IEP's SLP assessment language.

26. The Record shows that, on March 4, 2019, the IEP Team accepted proposals for both a Speech and Language assessment *and* an early re-evaluation of the student with testing, and

the diagnostician assigned to do both started the joint process almost immediately after the March 4, 2019 IEP meeting.

27. The DPHO's conclusion that APS failed to timely "implement" the SLP assessment ignores the fact that the re-evaluation process, which incorporated the SLP assessment component, was already underway prior to the date Student left the LEA's educational setting and disregards testimony by the diagnostician describing the timeline for conducting the re-evaluations in light of a two-week intersession, the end of the school year and end-of-the-year activities, ESY programming, the need for observations in the natural educational environment, and diagnosticians being off contract during the summer. Further, these factors impact the District's ability to meet New Mexico TEAM evaluation requirements.

## COUNT TWO

**The Record Does Not Support a Finding that Petitioners (Defendants) Met the Burden of Showing by a Preponderance That the District's Failure to Implement the SLP Assessment Language Resulted in A Substantive Failure.**

28. The District incorporates each and every of the preceding paragraphs as if fully restated herein.

29. Defendant did not request an independent educational evaluation ("IEE") at any time before filing for due process.

30. The DPHO could have *sua sponte* requested an IEE of the Student be undertaken *as part of the due process proceeding* while retaining jurisdiction to consider the IEE results. 34 C.F.R. § 300.502(d) (hearing officer may request an IEE "as part of" a hearing on a due process complaint).

31. Because the DPHO did not elect to include an evaluation as part of the proceeding, there is no evidence that the District failed to provide FAPE because the results of the SLP

evaluation are still unknown and thus there is no evidence that Student has receptive language needs for which he must receive services.

32. Further, in the proceedings below, evidence demonstrated that Student was receiving services from the classroom teacher and staff for communication needs that arose in the context of his academic day.

33. "A failure to reevaluate a student when the IDEA requires it would not necessarily be a procedural violation that denied a FAPE in all circumstances. When the reevaluation would not have any significant effect on a student's educational program and opportunities, the violation would be harmless." Bell, 2008 WL 5991062 at *26. Evaluations and IEPs are distinct concepts. The purpose of an evaluation is to gather data about a child's disability and unique needs. The IEP team uses a holistic approach to interpret this data, along with other sources of information about a child, and hand-crafts an IEP that meets the child's unique needs. "The IDEA is not designed to ensure that students are appropriately labeled but that they are appropriately educated." Id., at *27; see also Heather S. v. State of Wis., 125 F.3d 1045, 1055 (7th Cir. 1997) ("The IDEA concerns itself not with labels, but with whether a student is receiving a free and appropriate public education.").

34. At all relevant times, the District provided the Student an individualized program of educational and related services reasonably calculated to enable N.B. to make progress appropriate in light of his circumstances. See Endrew F., 137 S.Ct. at 999. Additionally, expert testimony informed that Student's communication needs could be met through the programming at Montezuma.

35. District has been harmed by the DPHO's unsupported findings and conclusions that improperly shifted the burden of proof from the administrative Petitioners (Defendants) to the District. The District thus seeks review and reversal of the same.

### COUNT THREE

**Even if APS Violated IDEA, which APS Disputes, the DPHO Exceeded His Authority by Imposing Obligations upon the District that Amount to an Award of Impermissible and Excessive Monetary Damages.**

36. The District incorporates each and every of the preceding paragraphs as if fully restated herein.

37. The DPHO failed to tie the remedy of an independent SLP evaluation to the Record in any way to justify the same.

38. A DPHO does not have unbounded discretion in fashioning equitable relief under IDEA.

39. Instead, "the inquiry must be fact specific and, to accomplish IDEA's purposes, the ultimate award must be reasonably calculated to provide the educational benefits that would have accrued from special education services the school district should have provided in the first place." Reid ex rel. Reid v. district of Columbia, 41 F.3d at 523.

40. The DPHO failed to tie to the Record his order that APS pay for an independent evaluation by an expert in the area of speech and language where the DPHO cited no evidence to even suggest that the LEA would actually exercise undue influence on the evaluation process.

41. Suggesting that the LEA might exercise undue influence over the evaluation process ignores evidence to the contrary, including the fact that it was the District that proposed a speech and language assessment by the time of the March 4, 2019 IEP meeting. See Ex. A at p. 48; see also Ex. A at 51.

42. Further, the DPHO generally found all witnesses in the proceeding below to be credible for truthfulness and that "no single witness [] stands out as being untruthful." Ex. A at 41, ¶145.

43. Last, the DPHO failed to tie to the Record his order that APS pay for Defendants' *independent* educational evaluation where the DPHO made no finding that the District lacks staff who can appropriately perform an SLP evaluation. To the contrary, the DPHO found all of the SLP-related staff credible.

44. The District's experts are fully capable of helping the District appropriately assess the Student's educational needs and design an educational program calculated to confer meaningful benefit upon Student.

45. New Mexico rules control how IDEA is implemented in this State and make funding to school districts dependent upon school districts' compliance with New Mexico rules; the DPHO's Decision contravenes New Mexico rules and could render vulnerable the District's funding as it is disbursed through the New Mexico Public Education Department. See, e.g., NMAC 6.31.2.3 (2007) (Statutory authority); 6.31.2.7 (Definitions); 6.31.2.9 (Public agency responsibilities); and 6.31.2.11 (Educational services for children with disabilities).

46. The relief available under IDEA is limited by controlling case law. See, e.g., Padilla ex rel. Padilla v. School District No. 1, 233 F.3d 1268, 1273-1274 (10th Cir. 2000) (Section 1983 is not available to enforce the IDEA).

47. IDEA provides a comprehensive remedial scheme for violations of IDEA requirements, and those limitations cannot be circumvented by an IDEA due process hearing officer. See, e.g., Diaz-Fonseca, supra. Moreover, allowing this DPHO's award to stand would

come at the expense of other educational benefits for other District students by diverting scarce educational resources. Id.

48. District has been harmed by the DPHO's unsupported findings and conclusions that blatantly shifted the burden of proof from the administrative Petitioner (Defendant) to the District. The District thus seeks review and reversal of the same as well as injunctive relief staying that portion of the Decision requiring the District to expend public dollars unnecessarily for a remedy of an independent SLP evaluation that is unsupported by the Record.

## COUNT FOUR

**The DPHO Improperly Characterized the Threat Assessment Process and Incorrectly Determined Parents Have Rights to Participate in the Same Beyond that which Occurred in this Case.**

49. The District incorporates each and every of the preceding paragraphs as if fully restated herein.

50. The DPHO erred in determining that the Threat Assessment process for regular education students is different than that applicable to special education students. The process and participants involved are the same for students in both special education and regular education (although the funding for such participants is different).

51. The DPHO erred in determining that the District was legally required to include the Defendants in all steps of the Threat Assessment process including meeting with staff and/or preparation of Threat Assessment documentation.

52. The DPHO erred in concluding the Threat Assessment process participants do not constitute a "law enforcement team" and cited no evidence or legal source to support such erroneous conclusion.

53. In fact, the Threat Assessment process is one of a law enforcement unit and the records created through that process are not considered educational records under the Family Educational Rights and Privacy Act ("FERPA").

54. The DPHO incorrectly characterized the rights of Defendants to participate in the Threat Assessment process and law enforcement unit activities.

55. The DPHO incorrectly concluded that "because the TAT group meeting included a psychologist to address the Student's special education needs, and because there was a discussion and TAT document consideration of an FBA/BIP, then the Petitioners have met their burden to prove the meeting was a meeting regarding an evaluation and for the provision of a FAPE to the Student." See Ex. A, at 103.

56. The DPHO elevated form over function when he placed significance on the fact that a school psychologist facilitates a portion of the Threat Assessment process meetings for special education students and a private psychologist from Southwest Family Guidance facilitates a portion of the Threat Assessment process meetings for general education students. There was no evidence in the Record to suggest that these individuals, simply because of their titles, offer different services or play different roles in the Threat Assessment process.

57. Moreover, the DPHO incorrectly concluded that Defendants were entirely excluded from the Threat Assessment process yet the Record includes documentation of the school informing the parents of a threat assessment and providing documentation of the same as well as arranging a meeting to discuss such paperwork. While Mr. Brainard does "not recall" having received a copy of the Threat Assessment Plan Summary, he admits to meeting with school personnel and the email exchange between him and the Principal on the very same day as he was provided the Threat Assessment Plan Summary indicates the school was asking to specifically

speak to him about the same. This conflict in evidence does not amount to a showing by the Defendants by *a preponderance* of the evidence that they were entirely excluded from acting in a meeting regarding an evaluation and a provision of FAPE to their child.

58. The District will introduce evidence clarifying that the only reason for the distinction between facilitators for general and special education students is funding.

59. The Threat Assessment process was developed by public schools after the Columbine mass shooting and the purpose of a Threat Assessment meeting is to assess the threat level of a particular student, regardless of that particular student's special education eligibility, in order to keep students and staff safe by referring to law enforcement and other appropriate personnel students who appear to pose a plausible safety and health threat to the school community.

### COUNT FIVE

**The DPHO Erred by Failing To Properly Consider the Safety of School Personnel when Crafting a Remedy Related To the Threat Assessment Process**

60. The District incorporates each and every of the preceding paragraphs as if fully restated herein.

61. To address its conclusions related to Threat Assessment process, the DPHO ordered the following relief: "the Student's Parents will be invited to participate in all future TAT meetings, as a special education meeting, should the TAT Team continue to be composed as in the past and continue to consider the Student's special education needs." (Ex. A, at 112).

62. The DPHO's remedy related to the Threat Assessment process meetings and records (Ex. A, at 112), does not address important safety concerns raised during the hearing.

63. The District presented credible evidence that the confidentiality of persons involved in the Threat Assessment process is important to their safety. Although finding Larry Fortess, the

District's Director of Threat Assessment, credible, the DPHO entirely ignored evidence that Mr. Fortess had actually "experienced that parents have retaliated against schools for conducting threat assessments" and evidence that the District has had to ban some parents from campus for stalking, threatening and even attacking teachers.

64. It was improper for the DPHO to entirely disregard the District's safety concerns for its personnel in the Threat Assessment process.

65. It was improper for the DPHO to entirely disregard the District's safety concerns for its personnel in the Threat Assessment process and order parental involvement in all future aspects of the Threat Assessment process particularly where he did not also instruct how the District would keep everyone safe given undisputed evidence in the Record of Defendant-Father's violent history.

66. The District will also introduce evidence of the potential detrimental effect parent involvement may have on the candor of witnesses or objectivity of the Threat Assessment process.

67. The importance of the student and personnel safety in the educational setting cannot be understated. Threat assessments are specifically designed to protect students.

68. The DPHO did not explore whether remedies less than parent participation – and more safe than the same – in all future Threat Assessment process meetings could suffice to address the issues raised.

69. The remedy crafted by the DPHO requires the District to compromise the accuracy of the Threat Assessment process, by either: (1) requiring the presence of parents if Student's special education needs are considered (compromising the candor of witnesses and objectivity of the threat assessment process); or (2) requiring Threat Assessment process participants not to consider the student's special education needs (which would result in a lack of information

necessary to perform an accurate Threat Assessment). It is illogical to conclude that ignoring the Student's special education needs during such a meeting would serve to benefit the Student.

## COUNT SIX

70. The DPHO exceeded his authority by granting prospective relief requiring parental involvement in all aspects of the Threat Assessment process.

## COUNT SEVEN

### The District Requests Leave to Present Additional Evidence to the Court

71. The District incorporates each and every of the preceding paragraphs as if fully restated herein.

72. The District seeks leave to introduce additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii) (in any action brought under this paragraph, the court shall hear additional evidence at the request of a party); 34 C.F.R. § 300.516.

73. In reviewing an agency disposition under the IDEA, the district court must receive the record of the administrative proceedings, hear additional evidence at the request of a party, base its decision on the preponderance of evidence, and give due weight to the administrative proceedings. Garcia v. Bd. of Educ. of Albuquerque Pub. Sch., 520 F.3d 1116, 1125 (10th Cir. 2008); Murray By & Through Murray v. Montrose Cnty. Sch. Dist. RE-1J, 51 F.3d 921, 927 (10th Cir. 1995).

74. The evidence sought to be introduced by District relates to the foregoing points of appeals and will be the subject of motion practice.

## CONCLUSION

WHEREFORE, as relief for the harms alleged herein, the District respectfully requests the Court enter an order setting aside the challenged portions of the DPHO's Decision and declaring that those portions of the Decision and the DPHO-imposed remedy are, as detailed herein, unjust, unreasonable, and inconsistent with the purposes of IDEA.

Respectfully submitted,

**ADAMS+CROW LAW FIRM**

By: */s/ Samantha M. Adams*
Samantha M. Adams
5051 Journal Center Blvd., NE
Suite 302
Albuquerque, NM 87109
Phone: 505-427-3227
Fax:    505-212-0439
sam@adamscrow.com

*Attorneys for Plaintiff Board of Education*
*Albuquerque Public Schools*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on May 1, 2020 we filed the foregoing electronically through the CM/ECF system, which caused all counsel of record to be served by electronic means, as more fully reflected in the Notice of Electronic Filing.

Gail Stewart
3800 Osuna Road NE, Suite 1
Albuquerque, NM 87109
gstewart@66law.com

**ADAMS+CROW LAW FIRM**

By */s/Samantha M. Adams*
Samantha M. Adams